## JORDAN ET AL. *v.* MALLOY

[No. 31, September Term, 1969.]

*Decided November 7, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Theodore S. Miller,* with whom were *Marvin J. Land and Miller, Rosenthal & Land* on the brief, for appellants.

*Thomas A. Farrington,* with whom were *Hal C. B. Clagett* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Once more we shall consider sequelae of the tragic collision which, on 14 March 1964, killed two and maimed five young St. Mary's countians. The melancholy details will be found in *Jordan v. Morgan,* 247 Md. 305 (1967) and *Jordan v. Morgan,* 252 Md. 122 (1969).

On 2 March 1966 the four surviving passengers sued

Frank Dyson, the driver of one of the two cars, the Rev. James E. Malloy (Fr. Malloy) the owner of the other car, and Frances Morgan, the administratrix of the driver (Morgan) of Fr. Malloy's car. In first *Jordan* we vacated a summary judgment in favor of Morgan's estate, at the same time remanding the case for further proceedings. We affirmed, in second *Jordan*, substantially the same motion, holding that the suit was not timely filed as to Morgan's estate.

Fr. Malloy took the position that the suit against him could be concluded in his favor by summary judgment. In his motion of 21 March 1968 he claimed that he is not liable for the tort of his employee, George Morgan, since it is undisputed that he "was not acting as an agent within the scope of his authority while driving * * * [Fr. Malloy's] vehicle at the time of the accident." The motion was denied initially by the trial judge, Bowen, J., on 12 June 1968;[1] however, after a rehearing on 27 January 1969, the motion was granted. The appellants insist that Judge Bowen should have allowed his first decision to remain unchanged. We agree.

At the time the summary judgment was entered, the court below had before it the following documents, each of which relate the events leading up to the accident:

1. An affidavit filed along with a motion for summary judgment by Fr. Malloy on 21 March 1968.
2. A signed statement given by Fr. Malloy to his insurer on 20 March 1964 but not filed in this proceeding (by the appellants) until after the 12 June 1968 hearing.
3. An affidavit filed by Fr. Malloy on 21 January 1969.

---

1. It appears that Judge Bowen denied the motion on the basis of representations by counsel for the appellants that a signed statement given by Fr. Malloy to his insurer, which had not been included in the record, raised a dispute as to whether Morgan was acting within the scope of his employment. The latter statement was inserted into the record prior to the second hearing and is before us on this appeal.

4. Depositions taken of appellants Barnes and Briscoe (passengers in the car owned by Fr. Malloy) on 26 February 1968.
5. Answers of Fr. Malloy to the interrogatories of appellant Dyson.

In his first affidavit (21 March) Fr. Malloy indicated that Morgan came to St. George's Catholic Church in Valley Lee on the day of the accident (a Saturday) to perform some work at his (Fr. Malloy's) request. After Morgan worked for an hour he was asked by Fr. Malloy "to take his [Malloy's] automobile down to the service station to have it greased, washed, and to have the oil changed." Morgan, according to Fr. Malloy, went to the station "at approximately 11:30 a.m." and "returned about 12:30 p.m. with the car and gave * * * [him his] change." Fr. Malloy further indicated that after Morgan returned from the service station he asked permission to use the car "to get a haircut" at "Lexington Park." The permission was granted; however, it was "for the sole purpose of driving to Lexington Park to get a haircut. * * * When he went out the second time he was not using the automobile to aid * * * [Fr. Malloy] or to perform any chores for the church." Morgan was "expected" to return the car "at approximately 4:00 p.m." and "around 6:00 p.m." Fr. Malloy "became quite concerned." It was not until "about 7:20 p.m." that he was notified of the tragedy. He again emphasized that "[h]ad * * * [he] known that * * * [Morgan] had any other purpose in mind than to go to get a haircut and to return immediately * * * [he] would not have loaned him the car."

Fr. Malloy's answers to appellant Dyson's interrogatories do not differ in substance from what has been stated above, so we shall not repeat them.

At the hearing on 12 June the appellants referred to a signed statement given by Fr. Malloy to his insurer just six days after the accident. Within the statement is matter not referred to in the above affidavit. Thus, it

was indicated that Morgan was a regular employee (a sexton) of the church although he normally did not work on Saturdays. Also, the servicing of Fr. Malloy's car was not the only task requested of Morgan which required the use of a vehicle. Prior to his 11:30 a.m. departure, Morgan was asked "to go by and pick up mail at the Valley Lee Post Office and to pick up some altar breads at Holy Face Rectory in Great Mills." Apparently, the latter tasks were not accomplished during the one hour period in which the car was serviced and returned. Fr. Malloy wrote that he "learned later that he [Morgan] went to Holy Face Rectory for the altar breads around 3:00 p.m. Father Robert Lewis saw him there at around that time." After he learned about the accident he "called George's [Morgan's] house * * * about 8:30 p.m. * * * to find out about the altar breads, because [he] needed them for Sunday morning." Near the end of his statement Fr. Malloy wrote,

> "[h]ad I known that George [Morgan] had any other purpose in mind than to go and get a haircut and to return within a reasonable time, I would not have loaned him the car at that time. I would have expected him to return the car no later than 5 P. M. because he knew that when the car wasn't there I was on foot. * * * I did not however, discuss with him a time to return."

Joseph Barnes stated in his deposition that he saw Morgan at the Lexington Park Barbershop at "about 4:00 [to] 4:30" where Morgan informed him that "he had permission to use the Father's car for the night" and that they "were going out Saturday night." Thereafter, Morgan picked him up "between 6:30 and 7 o'clock" at his (Barnes') house. Also in the automobile were three other friends. Their destination at that time was Morgan's house which was "two, maybe three, miles" away so that Morgan could change his clothes. Afterwards, they would have gone "out to either a dance or a movie,

or something" but "[n]obody [had] made up their mind yet." The accident occurred "before he [Morgan] got to his house" and "just about in front of his house." The church, according to Barnes, was located between the two homes. However they drove past the road which leads to the church prior to the accident. He estimated that the accident occurred "between 7 and 7:30."

George Briscoe was also à passenger in the car driven by Morgan. He said that, in the past, he had observed Morgan drive the same car on "several" occasions but not beyond 4 to 5 P.M. Furthermore, he did not see any packages or mail on the back seat, where he was sitting, but did not have any occasion to observe whether anything had been placed on the front seat.

Judge Bowen, as noted earlier, declined to grant Fr. Malloy's motion for summary judgment on 12 June 1968. He said, in his opinion, that the affidavit and signed statement appeared to show "a genuine dispute as to what this person [Fr. Malloy] authorized this man [Morgan] to do and for what purpose the car was given * * *."

Fr. Malloy's second affidavit will be set out in its entirety since it is represented as an attempt "to clarify the situation:"

> "This affidavit is made for the sole purpose of clearing up any misunderstanding which exists between the first written statement that I signed and the subsequent typewritten affidavit.
>
> "It should be clearly understood that both the written statement and the affidavit are the truth.
>
> "As I stated in my affidavit, when young Morgan took my automobile for the second time on March 14, 1964, when I let young Morgan use my automobile for the second time on March 14, 1964, this was for the sole purpose of driving to Lexington Park to get a haircut.
>
> "As I stated in my signed statement, he had used the car earlier to run errands for me. I

had asked him to pick up mail at the Valley Lee Post Office and to pick up some altar breads at Holy Face Rectory in Great Mills. These were chores which he was to perform on the first trip. On the second trip, his sole use of the car was for the purpose of getting a haircut.

"I have no personal knowledge about when he picked up the altar breads. I have heard that he picked them up around 3:00 p.m. I do not have personal knowledge of this fact and would not swear to this fact under affidavit.

FATHER JAMES E. MALLOY"
(Certificate of Notary Public)

At the second hearing Judge Bowen attempted to reconcile the various documents noted above. This time he granted the motion. According to Judge Bowen

"* * * they seem to say that the Priest in this case sent an employee of the Church with his car to be serviced and gave him money to pay for the services. That in connection with this, he was requested to pick up certain materials and get the mail. He returned from this expedition and accounted for the change left out of the money he had and then requested permission to go get a haircut and use the car for transportation. This permission was given him and he took off, subsequently wrecked the car and killed himself."

* * *

"Nor is any of the series of [proposed] questions going to change that the boy driving the car should have, whether he did or not, * * * performed all the errands for the church on the first trip. At least he didn't disclose that he hadn't performed them and the evidence is pretty clear and compelling, it seems to me, that he had decided to appropriate the car to his own

use for the evening and was on a frolic of his own. * * * All of the previous statements and affidavits of the Father are tied together by this last one. It seems there is nothing in them which contradicts each other as I now read them. I am bound to say that before, I thought the one contradicted the other. In any event, I don't see any disputed question of fact now, relating to the liability of the Priest."

This case is "close" but we find ourselves unable to agree with the court below. We note at the outset the opinion of Judge Collins, for the Court, in *East Coast Freight Lines, Inc. v. Mayor and City Council,* 190 Md. 256 (1948), in which he referred to the principle that "* * * where the ownership of the vehicle causing the collision is in the defendant, and the driver thereof is in the general employment of the defendant, there is a reasonable presumption that at the time of the accident the driver is the servant of the defendant and acting within the scope of his employment." *Id.* at 286. To the same effect are *House v. Jerosimich,* 246 Md. 747, 750 (1967), and *National Trucking & Storage, Inc. v. Durkin,* 183 Md. 584, 588 (1944).[2] Thus, in order for Fr. Malloy to prevail at this stage of the proceeding, it must be perfectly clear that he has rebutted the presumption. We think there is still some question about that.

As we stated most recently in *Lipscomb v. Hess,* 255 Md. 109, 257 A. 2d 178 (1969), the purpose of a hearing on a summary judgment motion

"* * * is not to determine disputed facts, but to determine whether such issues exist. *Horst vs. Kraft,* 247 Md. 455, 231 A. 2d 674 (1967); *Carroccio vs. Thorpe,* 222 Md. 38, 158 A. 2d

---

2. Judge Bowen, at the second hearing, said that for the presumption to be applicable, the owner had to be present in the car at the time of the accident. This, as already noted, is not the true state of the law.

660 (1960) ; *Tellez vs. Canton R.R. Co.*, 212 Md. 423, 129 A. 2d 809 (1957) ; *White vs. Friel,* 210 Md. 274, 123 A. 2d 303 (1956). If facts are susceptible of more than one inference, the inferences must be drawn in the light most favorable to the person against whom the motion is made, *Lawless vs. Merrick,* 227 Md. 65, 175 A. 2d 27 (1961), and in the light least favorable to the movant, *Howard Cleaners of Baltimore, Inc. vs. Perman,* 227 Md. 291, 176 A. 2d 235 (1961) ; *Roland vs. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 155 A. 2d 691 (1959)." *Id.* at 118.

We think the "facts" related by the submitted documents are susceptible of more than one inference.

Judge Collins, for the Court, also indicated in *East Coast Freight Lines, Inc. v. Mayor and City Council, supra,* at 285, that

"[t]o be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master."

The facts, drawn in a light most favorable to the appellants, are that on the morning of the day of the accident Fr. Malloy asked Morgan, his sexton, to pick up the mail and also some altar breads at another church and to have the car serviced. Each of these tasks required the use of the car. It does not appear that any time limitation was placed on Morgan in which to perform his chores. It also seems clear that Morgan had performed only the task of having the car serviced when he returned at 12:30 p.m. to the church and gave Fr. Malloy his change. Thus, it can reasonably be inferred that when Morgan again departed with Fr. Malloy's automobile for the express pur-

pose of getting a haircut "at Lexington Park," he was also expected to complete his chores for the day by picking up the altar breads and the mail. We think the fact that Fr. Malloy telephoned Morgan's house at 8:30 p.m. to inquire about the altar breads "because [he] needed them for Sunday morning" is evidence of what he expected at the time of Morgan's second departure. We also note that Fr. Malloy had information that Morgan picked up the altar breads at approximately 3:00 p.m. Lastly, we observe that the accident occurred at approximately 7:00 p.m. at a location not too distant from the church. There is no evidence that the altar breads and the mail were not in the car.

We are unwilling to say that a "genuine dispute" does not exist in respect of the material facts upon which must rest a decision that Morgan was or was not acting within the scope of his employment. Fr. Malloy allowed Morgan the use of his car so that certain chores could be completed. Thus, we cannot conclude that Morgan's conduct was not consistent with the nature of his employment. *East Coast Freight Lines, Inc., supra.* Inasmuch as the accident occurred about 7:00 p.m. and in light of the fact that Morgan was not ordered to return by a designated time, neither can we infer that the occurrence was not "during a period not unreasonably disconnected from the authorized period of employment." *Id.* Lastly, in light of the location of the accident, we cannot agree with Judge Bowen that a jury could not infer that Morgan was not off "on a frolic of his own." We think it can be inferred that Morgan's presence in the area was "actuated at least in part by a purpose to serve the master." *East Coast Freight Lines, Inc., supra; see Carroll v. Hillendale Golf Club, Inc.,* 156 Md. 542, 545 (1929). It must be conceded, of course, that Judge Bowen's conclusion is one that *could* have been drawn from the facts. However, the summary judgment procedure "* * * is not a substitute for trial but a hearing to determine whether a trial is necessary * * * when there is no genuine controversy." *Lipscomb v. Hess, supra.* Accord-

ingly the judgment will be set aside and the case will be remanded for further proceedings.

*Judgment reversed.*

*Case remanded for further proceedings.*

*Costs to be paid by the appellee.*